## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>QUINCY WOODENLEGS,<br><br>Defendant. | **Case No. CR-10-150-BLG-RFC**<br><br><br>**ORDER DENYING MOTION<br>TO SUPPRESS** |

Defendant filed a motion to suppress statements given to law enforcement on November 4, 2010 because the statements were involuntarily given and were the product of coercion by agents/officers. Defendant also argues that a polygraph examination is a critical stage of prosecution to which he is constitutionally entitled to have counsel present. Finally, Defendant claims that a polygraph examination is a search subject to the Fourth Amendment and that his statements are the fruit of that improper search. The government opposes Defendant's motion. A hearing on this matter was held on August 11, 2011.

## FACTUAL BACKGROUND

In April, 2010, a male child was interviewed by a forensic interviewer and reported that he had been sexually abused by Defendant when he was a foster child in the residence of Defendant's mother on the Northern Cheyenne Indian Reservation. At the time of the alleged abuse, Defendant was approximately 22 and the child was 12. Defendant has a high school education.

On August 11, 2010, FBI Special Agents Timothy Boruff and Ernie Weyand contacted Defendant to speak with him regarding the allegations. The conversation between Defendant and the agents occurred in the agents' vehicle. Defendant denied any inappropriate contact between himself and the alleged victim and asked to take a polygraph examination.

On November 4, 2010, Agent Boruff gave Defendant a ride from Busby to the FBI office in Billings, Montana, to take a previously-scheduled polygraph examination. Defendant met with Special Agent Stacey Smiedala and Agent Boruff in the FBI conference room. Because Defendant had forgotten his glasses, the FD-328, "Consent to Polygraph" form and the FD-395, "Advice of Rights" form were read aloud to him. Defendant acknowledged that he understood his rights and signed the forms. At the suppression hearing, Defendant testified he did not remember the forms being read to him and he does not wear reading glasses; however, he did

acknowledge that he knew each and every right he was giving up when he signed each form.

The FD-328 Consent form specifically informed Defendant that he had the right to refuse to take the polygraph, the right to stop the test at any time and the right to refuse to answer any individual questions. Defendant signed the form at 9:45 a.m. The FD-395 Advice of Rights informed Defendant of his Miranda rights, including his right to have an attorney, which he waived. He signed the FD-395 at 9:50 a.m.

Agent Boruff left the room while Agent Smiedala interviewed Defendant. Defendant denied he had touched the alleged victim and agreed to go forward with the polygraph examination. The results of the polygraph showed that Defendant had been deceptive. Defendant then confessed that he lied during the polygraph examination and earlier interview, and that during the summer of 2007, he had fondled the alleged victim's genitals, under his clothing. Defendant reported that he apologized to the alleged victim the next day. Defendant told the agents that he was ashamed of what he had done to the child.

Agent Smiedala called Agent Boruff back in to the conference room and briefly reported what Defendant had told him. Defendant agreed to do a summary recording about his admissions to Agent Smiedala. The recording started at approximately 11:32 a.m., and finished at approximately 11:40 a.m. During the summary interview,

Defendant reported that he had been drinking a lot on a day in the summer of 2007, when he and the alleged victim were wrestling at Defendant's mother's home in Busby. Defendant reported that he had put his hand down the child's pants for two or three seconds and touched the child's penis, and after he did so, he felt like throwing up. Defendant also stated that he had apologized to the child the next day and told him that it should never have happened. Defendant described the clothing the child was wearing as a tank top, brief-style underwear and gym trunks. Defendant reported that he was wearing a black sweater and blue jeans at the time of the incident.

At the suppression hearing, Defendant testified that he lied during the entire recorded summary. Defendant stated he lied when he told the agents he had been drinking a lot, he lied when he told them he put his hands down the child's pants, he lied when he told them what the child was wearing at the time of the alleged offense, and he lied when he told them what he was wearing at the time of the alleged offense. Defendant's testimony at the suppression hearing was completely incredible.

Defendant told the agents he had not told the truth because he was ashamed of what he had done. Defendant reported that the statement he had just taped was made voluntarily, he had not been forced or promised anything, he had been treated fairly and advised of his rights including the right to remain silent. Defendant alleges he

was assured that his case would be handled tribally if he confessed, and was threatened with being away from his child if he did not confess. The entire interview, polygraph, and summary recording lasted approximately 2 hours.

Agents Boruff and Weyand gave Defendant a ride back to Busby. On the way, Defendant inquired if it would help his case if he provided drug information that he knew about several people in the Northern Cheyenne Reservation to the FBI. Agent Boruff and Agent Steve Chambers went back to speak with Defendant several weeks later, but he had no information that the agents believed useful.

## ANALYSIS

### I.  Were Defendant's Statements Involuntary?

Defendant argues his statements were involuntary and should be suppressed. To prove that his statements were involuntary, a Defendant is required to show that, in the totality of the circumstances, law enforcement obtained the evidence by overbearing his will. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). Under the Fourteenth Amendment, a confession is involuntary only if the police use coercive means to undermine the suspect's ability to exercise his free will. *See Henry v. Kernan,* 197 F.3d 1021, 1026 (9th Cir. 1999). In determining whether a statement is

voluntary, the court looks at the surrounding circumstances and the combined effect of the entire course of the officer's conduct upon the defendant. *See United States v. Polanco,* 93 F.3d 555, 560 (9th Cir.1996).

The test of voluntariness is well-established: "Is the confession the product of an essentially free and unconstrained choice by its maker? The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." *Collazo v. Estelle,* 940 F.2d 411, 416 (9th Cir. 1991). Courts that address this issue look at factors such as the declarant's state of mind, the physical environment in which the statement was given, and the manner in which the declarant was questioned. *See Mincey v. Arizona,* 437 U.S. 385, 398-99 (finding statement obtained from a defendant who was in the hospital, in near coma condition and in great pain, while encumbered with tubes, needles, and breathing apparatus, could not have been voluntary). The tone of voice used and the promises or representations made by the questioner have also been factors used to decide whether a statement was voluntary. *See Henry,* 197 F.3d at 1027 n. 3.

In *Henry*, the Ninth Circuit held that questioning which becomes psychologically coercive may result in an involuntary statement when the detective coerced the declarant to give a statement by representing that the declarant's

statement could not be used against him.  *Id*. at 1027.  The Ninth Circuit also found it significant that the declarant's statement was incoherent, confused, disjointed, and throughout the interview the declarant was shaken, frightened, and crying.  In that case, the detective's comments were considered to be misleading because they were "intended to convey the impression that anything said by the defendant would not be used against him for any purposes." *Id.* at 1027-28.

Not all misrepresentations made by law enforcement in obtaining a statement constitute coercive conduct.  *See United States v. Orso,* 266 F.3d 1030, 1039 (9th Cir.2001) (en banc).  "When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Id.* at 1036 (citing *Oregon v. Elstad,* 470 U.S. 298, 312 (1985)).  Further, a "defendant's mental state alone does not make a statement involuntary." *Id.* at 1039 (citing *United States v. Turner,* 926 F.2d 883, 888 (9th Cir.1991)).  Rather, "[c]oercive conduct by police must have caused [the defendant] to make the statements." *Id.*  Promises to tell the prosecutor or judge about cooperation are insufficiently coercive to render statements involuntary.  *United States v. Willard*, 919 F.3d 606 (9th Cir. 1990).  Promises of leniency are insufficiently coercive to render statements involuntary.  *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000).  An interrogating agent's promise to

inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect. *See United States v. Brandon,* 633 F.2d 773, 777 (9th Cir. 1980); *United States v. Glasgow,* 451 F.2d 557, 558 (9th Cir. 1971); *Fernandez-Delgado v. United States,* 368 F.2d 34, 35-36 (9th Cir. 1966).

Defendant has failed to demonstrate that law enforcement obtained his confession by overbearing his will. *Haynes v. Washington*, 373 U.S. 503, 513-14 (1963). He attended the August and November, 2010 meetings voluntarily. He also suggested taking a polygraph. At the end of the November 4, 2010 interview, Defendant confirmed that he participated in the encounter voluntarily and was not forced to say anything. He confirmed this verbally and in writing.

Defendant argues that the polygraph was used as a psychological tool to convince him the situation was hopeless unless he made statements that Agent Smiedala told him he should. Testimony at the suppression hearing did not support Defendant's allegations. There was no testimony of physical intimidation, not threats made, no yelling and no name calling. There was no statement made that his only hope to avoid prison was to admit the allegations.

When considering the physical environment in which the statement was given, Defendant came voluntarily and was not in custody. Agent Boruff offered Defendant a ride to and from the polygraph because Defendant was having vehicle problems. The interview was conducted in a conference room in the FBI office with one door. The physical environment was not coercive and Defendant was told he was free to leave at any point.

Finally, Defendant's recorded interaction between Agent Smiedala and Agent Boruff had a tone that was direct, respectful and even-keeled. The interview was cordial and nothing on the recording suggested that agents intimidated or threatened Defendant. Defendant did not sound like he was distressed or emotional. He was calm and articulate and the responses he gave were clear.

Defendant makes an allegation that he was promised if he admitted the allegations, federal charges would not be filed, he would not go to prison, and the matter would be handled in tribal court. However, contrary to that assertion, Defendant specifically states in his confession that he was not promised anything. Defendant was advised by the agents that after the investigation is complete, it is submitted to the U.S. Attorney's office for a determination of whether the matter will be handled by the federal system or tribal system.

However, even if the Court believes that agents did suggest that this matter was going to be referred to the tribal system, rather than the federal system, such a suggestion of perceived leniency would not be improper. The Ninth Circuit has held that statements suggesting leniency do not render subsequent admissions involuntary. *United States v. Coleman*, 208 F.3d 786, 791 (9th Cir. 2000); *Compare United States v. Okafor*, 285 F.3d 842, 847 (9th Cir. 2002) (confession voluntary though officer told defendant cooperation would help him avoid lengthy prison sentence) *with United States v. Tingle*, 658 F.2d 1332, 1336-37 (9th Cir. 1981) (confession involuntary when agent recited virtual litany of maximum penalties for crimes of which defendant was suspected, expressly stated that she would not see her two-year-old child "for a while," warned her that she had "a lot at stake," referring specifically to her child, and told her that if she failed to cooperate he would inform prosecutor that she was "stubborn or hard-headed.")

Defendant's coercion claims are also contrary to the advisement of rights forms that he signed. On both forms, Defendant attested that he had not been threatened or promised anything and he was willing to answer questions.

**II.    Was Defendant Entitled to Have Counsel Present During Polygraph Examination?**

Defendant asserts that an FBI polygraph request constitutes a critical stage of a criminal proceeding which gives rise to a Sixth Amendment right to counsel. He argues that the confession must be suppressed because he did not "knowingly and intelligently" waive that right to counsel.

The Sixth Amendment guarantees: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. Amend VI. However, a person's Sixth Amendment right to counsel attaches only "at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688 (1971). In *Kirby*, the Court "explained that the initiation of judicial criminal proceedings begins when 'the government has committed itself to prosecute, [for it is] only then that the adverse positions of government and defendant have solidified.'" *United States v. Pace*, 833 F.2d 1307, 1310 (9th Cir. 1987), quoting *Kirby*.

When the investigation is still ongoing, including during a polygraph examination, the government has not "committed itself to prosecute" as required by *Kirby* and Defendant has no Sixth Amendment right to counsel.

## III. Is a Polygraph Examination a Search Subject to the Fourth Amendment?

Defendant's final argument is that his statements were involuntary in violation of the Fourth Amendment because the polygraph examination constitutes a physical search that "without a valid warrant or informed consent to search, seizure of [his] heart rate, blood pressure, respiratory rate and skin conductivity (sweat production) violated Fourth Amendment protections."

The only federal court to publish an opinion addressing the issue of whether a polygraph examination is a Fourth Amendment search has rejected Defendant's argument. In *Stehney v. Perry*, 907 F.Supp. 806, 822 (D.N.J.1995), aff'd 101 F.3d 925 (3d Cir. 1996), the court ruled that a polygraph does not constitute a search within the meaning of the Fourth Amendment. Additionally, although this Court does not typically cite to unpublished opinions, the Ninth Circuit has rejected this argument in their unpublished opinion in *United States v. Jordan P.W.*, 168 Fed.Appx. 150 (9th Cir. 2006) when they stated: "We reject W.'s argument that a polygraph examination constitutes a search or seizure subject to the Fourth Amendment and know of no authority supporting it."

Even if a polygraph examination was a search subject to the Fourth Amendment, Defendant gave his consent to the polygraph before it was administered and even suggested that he be allowed to take a polygraph when originally questioned by law enforcement.

## CONCLUSION

Based upon the foregoing, IT IS HEREBY ORDERED that Defendant's Motion to Suppress is **DENIED**.

DATED this 12th day of August, 2011.


_/s/ Richard F. Cebull_____
RICHARD F.  CEBULL
U.S. DISTRICT COURT JUDGE